This action was instituted by John R. Reeves, former pastor of the First Reformed Church, of Hawthorne, New Jersey, against his wife for absolute divorce on the ground of adultery. The outstanding testimony offered to sustain the petitioner's charge is given by the two children — a daughter and son of the parties — and it is persuasive.
Petitioner alleges that on certain dates defendant committed adultery with one Charles D. Petry. The co-respondent did not avail himself of his privilege to intervene and file an answer. The wife interposed an answer denying the adultery and setting up two defenses by way of recrimination only, viz., adultery alleged to have been committed by the petitioner some ten years ago and also setting up allegations of extreme cruelty on the part of the petitioner towards her.
I am convinced that the petitioner has established the essential allegations of the petition.
Besides corroborative testimony showing an undue intimacy between the defendant and the co-respondent, clandestine *Page 533 
visits to the home of the parties in the absence of petitioner and particularly the exchange of intimate notes between the defendant and the co-respondent in church during services conducted by the petitioner, there was credible testimony directly showing the commission of the offenses charged.
The boy Edward, the son of the parties, told a straightforward story to the effect that one night he was awakened by toothache and called to his mother. She was in the hallway on the second floor of the parsonage at the time, on her way to the bedroom with the co-respondent, and she attempted to screen the co-respondent from the sight of the boy, and then sent the co-respondent into the bedroom, closing the door after him, and then attended to the son's toothache. This testimony points clearly in one direction only, that is, to the guilt of the defendant and her paramour. Under the circumstances, there could have been no reason or excuse for the presence of the co-respondent on the bedroom floor of the parsonage at that hour of the night.
The boy fixes the time as being around the first of January, 1928. There was testimony tending to show that during this month the co-respondent was confined to his home because of an illness. Accordingly the boy may have been mistaken as to the date, as to which there was nothing to fix it in his memory, but there is no doubt in my mind that he told the truth as to the incident which he witnessed.
Frances, the daughter of the parties, testified that on May 29th, 1928, the day before Memorial Day, the father was away from home and she had gone to bed and to sleep. Being awakened by voices downstairs and thinking that her father had returned, she ran downstairs to greet him. When she was close to the bottom of the stairway she saw the defendant lying on a couch in the sitting room opposite the foot of the stairway and the co-respondent lying on top of defendant, obviously, in flagrantedelicto. She distinctly recognized both her mother and the co-respondent. Alarmed at what she saw she ran back upstairs to bed without having made her presence known. Later that same night petitioner came home and found defendant in the sitting room only *Page 534 
partially dressed. He commented on this condition and she gave him an explanation which he soon found to be false. Both the defendant and co-respondent admit that Petry was at the parsonage that night. There is testimony that he went away but no testimony except his own statement that he did not return later that night.
Each of these children were intelligent and mature for their ages and each of them told a clear and straightforward story and the court attaches full credence to their testimony. Both of them were subjected to severe cross-examination which did not impair their stories to any extent.
Considerable time before this petitioner had become suspicious of the actions of defendant with the co-respondent and detectives were employed to watch the defendant. On the 10th day of May, 1928, defendant, with a bundle under her arm, was seen by the detectives and petitioner to go down a dark pathway alongside the church, in the rear of which was a large vacant plot of ground between the church and the railroad tracks. This was about ten forty-five in the evening. Almost immediately after the co-respondent was seen by these witnesses to enter the same cinder path and go to the rear of the church. The bundle was identified by petitioner as being the shawl which was produced in evidence and which he testified he found the next day to be covered with dirt and rubbish as though it had been spread on the ground such as existed behind the church. He found this shawl the next day in the parsonage stuck behind the sofa. The next morning there was also found behind the church a handerkerchief with a distinctively colored border which petitioner identified as belonging to defendant. Defendant and the co-respondent each admitted that they had gone down this pathway and behind the church on this evening at the same hour testified to by the petitioner and his witnesses, but each insisted that they did not see or meet one another. Defendant admitted she had a bundle that night but says it was a bundle of old clothes which she was taking to a woman who lived beyond the railroad tracks. Defendant first testified that on this occasion she stopped at the *Page 535 
house of the woman for about fifteen minutes and subsequently said she did not stop there at all. This woman testified that sometime during the spring of 1928, defendant did bring a bundle of clothes to her house one night but the witness could in nowise fix the date. The co-respondent's explanation of his presence at that time and place was neither satisfactory nor convincing. While there is no direct evidence of the commission of adultery on this occasion there was ample opportunity both of time and place, and taking into consideration the circumstances of their going there and a degree of intimacy and adulterous inclination shown both previously and subsequently, the inference might be drawn that the offense was committed at that time. Vogt v.Vogt, 105 N.J. Eq. 566; 148 Atl. Rep. 618.
The testimony of Minnie Feldman, a friend of both parties, shows that on the 9th day of September, 1927, the conduct of the parties in going to the cellar of the parsonage was scarcely compatible with their innocence. Petitioner himself testified that upon his unexpected return after this occurrence the defendant and co-respondent showed a confusion which strongly indicated improper conduct on their part. Both the defendant and co-respondent admitted that they were present at the preacher's house on this occasion.
There is considerable other testimony showing a suspicious intimacy between the parties for several months prior to the last offense charged. Petitioner himself testified that having become suspicious of his wife and the co-respondent he had begged her to give Petry up and that she refused. In this petitioner is partially corroborated by Mr. Bell, the sexton of the church. Mr. Bell also testified that he saw the exchange of notes in the choir during the church services and in fact found some notes and turned them over to petitioner. His testimony also leads to the conclusion that the defendant and co-respondent between them wrote and drew the obscene note which petitioner found in the parsonage the next day.
The defendant placed on the stand a number of witnesses but none of them convincingly testified to any material fact which would negative the testimony as to the commission *Page 536 
of the offense of adultery by the defendant on the occasions hereinbefore recited.
The testimony to the effect that the petitioner condoned the offenses of adultery is not at all convincing and I find that the same were not condoned.
There was no satisfactory testimony presented in support of the recriminatory charges.
As to the adultery charged by defendant, legal proof was lacking. Howard v. Howard, 77 N.J. Eq. 186.
There was no satisfactory testimony to prove that the petitioner had been guilty of a matrimonial offense. Cilente v.Cilente, 104 N.J. Eq. 605.
A decree for the petitioner is advised. *Page 537